OPINION
{¶ 1} Defendant-appellant Spencer D. Wells appeals from his conviction and sentence, following a guilty plea, upon a charge of Possession of Crack Cocaine, a first degree *Page 2 
felony. Wells contends that his trial counsel was ineffective for having advised him to plead guilty despite the pendency of a motion to suppress the evidence in his case that was sure to have succeeded. The record fails to demonstrate either of the predicates for this contention. The record does not demonstrate that his trial counsel advised him to accept the plea bargain that was offered by the State; and the record also does not demonstrate that the motion to suppress, which had not been the subject of an evidentiary hearing when Wells pled guilty, was sure to have succeeded. Finally, the record also fails to demonstrate that Wells's trial counsel either misadvised him, or inadequately advised him, concerning the likelihood that his pending motion to suppress would succeed. Accordingly, the judgment of the trial court is Affirmed.
 I {¶ 2} Wells was charged by indictment with four counts involving the possession of cocaine, and one count of Possession of Criminal Tools. The First Count charged Wells with Possession of Crack Cocaine in an amount equaling or exceeding 10 grams, but less than 25 grams. The Second Count charged Wells with Possession of Cocaine (not crack cocaine) in an amount equaling or exceeding 25 grams, but less than 100 grams. The Third Count charged Wells with Possession of Crack Cocaine in an amount equaling or exceeding 100 grams. This count included a major drug offender specification. The Fourth Count charged Wells with Possession of Cocaine (not crack cocaine) in an amount equaling or exceeding 5 grams, but less than 25 grams. The Fifth Count charged Wells with Possession of Criminal Tools. Each of these counts alleged that the offense occurred on or about August 15, 2006. *Page 3 
 {¶ 3} Wells filed a motion to suppress evidence, contending that evidence was obtained as a result of an unlawful search and seizure. Specifically, Wells contended in his motion that the police officer who stopped the car he was in lacked a reasonable and articulable suspicion sufficient to justify the stop, or, in the alternative, that a pat-down weapons frisk conducted immediately after the stop lacked a reasonable basis. In support of his motion, Wells attached an eight-page print-out entitled "Narrative Information," appearing to have been generated by Gregory J. Gaier, one of the officers involved in the stop, search, and subsequent arrest.
 {¶ 4} Before Wells's motion to suppress was heard, he entered into a plea bargain with the State wherein he pled guilty to the most serious of the four drug possession charges — the one charging him with Possession of Crack Cocaine in an amount equaling or exceeding 100 grams — the other four charges were dismissed, and the major drug offender specification attached to the count to which he pled guilty was also dismissed.
 {¶ 5} The trial court conducted a plea colloquy, accepted Wells's guilty plea, and ultimately imposed a mandatory ten-year sentence. From his conviction and sentence, Wells appeals.
 II {¶ 6} Wells's sole assignment of error is as follows:
 {¶ 7} "APPELLANT'S CONVICTION MUST BE REVERSED, AS IT RESULTED FROM A GUILTY PLEA THAT WAS INVALID AND MUST BE ALLOWED TO BE WITHDRAWN."
 {¶ 8} Although Wells frames his assignment of error as a broad attack on the *Page 4 
validity of his guilty plea, it is clear from the text of his brief that he is contending that his trial counsel was ineffective for having "advised [him] to plead guilty," for having failed to advise him that his motion to suppress was likely to succeed, or both.
 {¶ 9} The record does not support Wells's contentions. There is nothing in the record to establish that Wells's trial counsel advised him to accept the plea bargain offered by the State. There is nothing in the record to establish what Wells's trial counsel advised him at all. The decision whether to accept the plea bargain was, of course, ultimately Wells's decision to make.
 {¶ 10} The essence of Wells's argument is that his trial counsel failed to advise him that his motion to suppress was likely to succeed. Again, there is nothing in the record to establish what advice Wells received from his trial counsel in that regard. The record reflects that Wells replied in the affirmative to the trial court's questions: (1) had he discussed all of the elements of the offense and all possible defenses with his trial counsel; and (2) was he satisfied with his trial counsel's representation; the record does not reflect what Wells's trial counsel's advice to him was. For all we know, Wells's trial counsel may have advised him that his motion to suppress had an excellent chance of succeeding, and that Wells would be better advised not to take the plea bargain the State was offering, but to take his chances with the suppression motion. Based on this record, we are reduced to mere speculation in determining what Wells's trial counsel may have advised him.
 {¶ 11} In large part, Wells's argument is based upon his assertion that his suppression motion was certain to succeed, because the police narrative by Gregory Gaier, just one of the police officers who made the stop, does not contain a sufficient recitation of facts to support a finding that the officers had a reasonable, articulable suspicion to justify *Page 5 
the stop. The crucial part of Gaier's narrative is as follows:
 {¶ 12} "AT THE ABOVE LISTED DATE AND TIME, MYSELF AND DET. JOEY MYERS WERE MONITORING THE ALL IN ONE CONVENIENCE GAS STATION LOCATED AT 119 N. JAMES H. MCGEE BLV. IN THE PAST, MYSELF AND OTHER MEMBERS OF OUR UNIT HAVE MONITORED THESE PAY PHONES AT THIS BUSINESS FOR SUSPECTED DRUG ACTIVITY. OFFICERS AND DETECTIVES IN THIS UNIT HAVE MADE COUNTLESS ARRESTS FOR DRUG AND WEAPONS VIOLATIONS THROUGHOUT THE PAST, RESULTING FROM OUR INVESTIGATIONS. DURING OUR PAST INVESTIGATIONS, WE WOULD COMMONLY ENCOUNTER INDIVIDUALS ARRIVING AT THIS BUSINESS, MAKE PHONE CALLS AND EITHER WAIT FOR SUSPECTED DRUG DEALERS TO ARRIVE OR TO LEAVE AND MEET SUSPECTED DRUG DEALERS TO ENGAGE IN ILLEGAL DRUG TRANSACTIONS. AT APPROXIMATELY 1821 HRS., WHILE MONITORING THE ALL IN ONE PARKING LOT, MYSELF AND DET. MYERS, OBSERVED A 1995, BLACK DODGE NEON, INDIANA PLAE 19C5977, PULL INTO THE PARKING LOT AND PULL DIRECTLY NEXT TO ONE (1) OF THE PAY PHONES IN THE LOT. WE COULD OBSERVE THE VEHICLE WAS OCCUPIED BY TWO (2) WHITE MALES, LATER IDENTIFIED AS JOHN BICKEREST AND CHRISTOPHER MERDER. BICKEREST, THE DRIVER OF THE CAR, EXITED THE CAR AND MADE A PHONE CALL FROM THE PAY PHONE, LASTING APPROXIMATELY ONE (1) MINUTE. AFTER COMPLETING THE CALL, BICKEREST REENTERED HIS CAR AND THEY BEGAN TO PULL FROM THE PARKING LOT. DUE TO THE FACT THAT THIS ACTIVITY WAS CONSISTENT WITH DRUG INVESTIGATIONS WE HAVE INVESTIGATED IN THE PAST AT THIS LOCATION, WE DECIDED WE WOULD *Page 6 
FOLLOW THEM TO SEE IF THEY WOULD, IN FACT, ENGAGE IN ANY ILLEGAL DRUG ACTIVITY.
 {¶ 13} "WE CONTACTED SGT. M. SPIERS, DET. D. HOUSE, DET. S. EMERSON, AND DET. D. HALL, WHO ARRIVED AND ASSISTED IN THE INVESTIGATION.
 {¶ 14} "WE FOLLOWED THE BLACK NEON AS IT TRAVELED SOUTH ON McGEE TO EB ON ROUTE 35. WE CONTINUED TO FOLLOW IT WITH THE BELOW LISTED ROUTE THAT THE VEHICLE WOULD TRAVEL: EAST ON R35 TO SOUTH ON I75, THEN EXITING ON W. STEWART ST. THEY THEN TRAVELED BACK NORTH ON I75 FROM KIRKHAM ST. TO EB35. WE TRAVELED ON EB35 TO NB ON SMITHVILLE RD. WE TOOK SMITHVILLE NORTH AND TURNED WEST ONTO E. THIRD ST. WE FOLLOWED THE VEHICLE UNTIL IT ARRIVED AT THE EAST THIRD GROCERY STORE LOCATED AT E. THIRD AND SPERLING AVE.
 {¶ 15} "THEY PULLED INTO THE PARKING LOT AT 1838 HRS. THEY THEN WENT DIRECTLY TO THE PAY PHONE LOCATED IN THIS PARKING LOT. HERE, BOTH BICKEREST AND MERDER MADE APPROXIMATELY EIGHT (8) PHONE CALLS FROM THE PAY PHONE. AFTER ATTEMPTING THESE CALLS, THEY LEFT THE EAST THIRD GROCERY STORE AND TRAVELED WEST ON E. THIRD ST. TO THE CLARK STATION LOCATED AT E. THIRD ST. AND PHILADELPHIA ST.
 {¶ 16} "ONCE IN THE PARKING LOT, THEY AGAIN WENT TO THE PAY PHONE AND BICKEREST MADE ANOTHER PHONE CALL. THEY STAYED IN THE PARKING LOT FOR APPROXIMATELY SIX (6) MINUTES, NEVER EXITING THE CAR. AT APPROXIMATELY 1856 HRS., THEY LEFT THE CLARK GAS STATION AND TRAVELED BACK TO THE EAST THIRD GROCERY STORE WHERE BICKEREST *Page 7 
MADE ANOTHER CALL FROM A PAY PHONE. AFTER COMPLETING THE CALL, THEY THEN TRAVELED BACK WEST ON E. THIRD ST. TO THE SUBWAY RESTAURANT AND PARKED IN THE PARKING LOT.
 {¶ 17} "BOTH INDIVIDUALS SAT IN THE CAR, NEVER EXITING THE VEHICLE. BOTH BICKEREST AND MERDER CONTINUED TO WATCH TRAFFIC AS IT PASSED THE PARKING LOT. AT APPROXIMATELY 1919 HRS., THEY LEFT THE SUBWAY PARKING LOT AND PULLED ACROSS THE STREET TO THE CLARK STATION ONCE AGAIN. THEY STAYED IN THE PARKING LOT FOR APPROXIMATELY FOUR (4) MINUTES, AT THIS TIME, MERDER PLACED A CALL FROM THE PAY PHONE.
 {¶ 18} "AT APPROXIMATELY 1923 HRS., THEY LEFT THE CLARK STATION AND AGAIN TRAVELED BACK TO THE SUBWAY PARKING LOT, PARKING IN A PARKING SPOT IN THIS LOT. AGAIN, NEITHER OCCUPANT EXITED THE CAR TO ENTER THE STORE. DETECTIVES CONTINUED TO MAINTAIN CONSTANT SURVEILLANCE ON THE VEHICLE.
 {¶ 19} "AT APPROXIMATELY 1929 HRS., BICKEREST, THE DRIVER OF THE NEON, EXITED HIS CAR AND BEGAN TO WALK FROM THE PARKING LOT, ACROSS E. THIRD ST., AND THEN SOUTH ON S. MONMOUTH ST. DETECTIVES MONITORED BICKEREST AS HE BEGAN TO WALK SOUTH ON S. MONMOUTH, APPROACHING 22 S. MONMOUTH ST. WE COULD OBSERVE A BLUE FORD EXPEDITION PARKED IN FRONT OF 22 S. MONMOUTH ST. THIS VEHICLE WAS OCCUPIED BY A DRIVER, LATER IDENTIFIED AS SPENCER WELLS, A PASSENGER IDENTIFIED AS GEORGE LUCAS, AND A BACK SEAT PASENGER [sic], IDENTIFIED AS STACEY WELLS.
 {¶ 20} "BICKEREST WALKED DIRECTLY TO THE FRONT, PASSENGER DOOR *Page 8 
AND MADE CONTACT WITH LUCAS. DET. HALL, DET. MYERS, AND I, OBSERVED HIM APPROACH THE PASSENGER WINDOW. ONCE BICKEREST ARRIVED AT THE FRONT, PASSENGER WINDOW, DET. MYERS AND I OBSERVED HIM ENGAGE IN A SHORT CONVERSATION. BICKEREST THEN HANDED SOMETHING TO THE PASSENGER, LUCAS, AND, IN RETURN, LUCAS HANDED SOMETHING BACK TO BICKEREST.
 {¶ 21} "DUE TO OUR PAST EXPERIENCE AND THE CIRCUMSTANCES, WE BELIEVED THAT A DRUG TRANSACTION WAS NOW OCCURRING. WE DECIDED THAT WE WOULD STOP THE OCCUPANTS IN THE FORD EXPEDITION AND BICKEREST TO INVESTIGATE THE POSSIBLE DRUG TRANSACTION. THE DETAILS OF THE STOP, OF ALL THE INDIVIDUALS, ARE LISTED BELOW, ALL OCCURRING AROUND THE SAME TIME."
 {¶ 22} An immediate result of the stop was the discovery of a plastic bag that Lucas said was "just weed." Now having confirmed that drugs (marijuana) were involved, the officers conducted a pat-down frisk of the occupants of the Ford Expedition. The pat-down frisk of Wells led to the discovery of illegal drugs on his person.
 {¶ 23} The propriety of the stop obviously depends on whether the officers had a reasonable, articulable suspicion, based on what they had observed, that a drug transaction was occurring, or had occurred, in front of them. These issues are notoriously fact-sensitive. Even if we were to conclude that Gaier's narrative, attached to the motion to suppress, was not sufficient, that would not establish that Wells's motion to suppress was sure, or even likely, to succeed. The narrative is not the equivalent of the testimony that the State would elicit at the suppression hearing, had a suppression hearing taken place. *Page 10 
The State could have elicited additional details, not contained in the narrative, and could also have had Gaier explain why, based on his experience and training, he concluded that a drug transaction was taking place. Furthermore, the State could have called the other officers involved to testify, and they may have made additional observations, not mentioned in Gaier's narrative.
 {¶ 24} It is impossible to determine, from this record, how likely, or how unlikely, it would have been that Wells's motion to suppress, which had not yet been the subject of an evidentiary hearing, would have succeeded, had Wells not made the decision to accept the offered plea bargain. Nor is it possible to determine, from this record, what Wells's trial counsel may have advised Wells with regard to the chances of success of the motion to suppress. Without any basis for determining either of these factual issues, the presumption that an attorney at law, admitted to practice in this state, in good standing, has competently represented a defendant cannot be overcome. See State v. Lytle (1976),48 Ohio St.2d 391, 397, vacated and remanded on other grounds (1978),438 U.S. 910.
 {¶ 25} Wells's sole assignment of error is overruled.
 III {¶ 26} Wells's sole assignment of error having been overruled, the judgment of the trial court is Affirmed.
 WOLFF, P.J., and GRADY, J., concur. *Page 1